2431-34, Clare Hanley v. New York City Health and Sooning. Thank you. Thank you. Oh. That is true. Can I talk to the court deputy for a second? This corresponds to this case, but I thought we were calling this case next. I want to make sure I'm looking at the right little slip. Which case are we calling right now? Okay, so it looks like your slip is wrong. Oh, it's just the number. Got it. So if I cross this out, and I think 2431-34, then we're otherwise set. Appreciate it. Thank you so much. Okay, sorry, just a little administrative confusion on my part. But with that, I'm going to recall it's, like I said, 2431-34, Hanley v. New York City Health, and it's Attorney Smith-Simon? Yes, that's correct. Good morning. May it please the Court, I'm Molly Smith-Simon for the appellant, Dr. Clare Hanley, in this age discrimination employment matter. This appeal presents three central errors that warrant reversal after a trial and a verdict for defendants. First, the district court usurped the jury's role by granting the city defendant's summary judgment on serious due process violations that were clearly established, where the New York City defendant deprived Dr. Hanley of her property and liberty interests in practicing as a radiologist at Kings County Hospital Center after 16 years of employment. And secondly, by granting the SUNY downstate defendant's summary judgment motion, despite material issues of fact that Dr. Reed was aware of Dr. Hanley's strong performance metrics and was aware of the negative performance claims by the city defendants, but failed to investigate. Rather, at a meeting about the termination with Dr. Hanley, she made a statement that older doctors should know when to retire, that they're drooling at conferences and can't be awakened. Can I ask a sort of step back and ask a big picture question that I was struggling with in looking at this case? The withdrawal of privileges is a multi-step process, and the first thing that happens is Dr. Hanley makes a recommendation, and then the board suspends and ultimately revokes, and then there's an appeal, and then there's an appeal process, and that's part of the due process claim. This claim was sort of brought while that was still underway, and I'm trying to figure out whether the withdrawal of privileges was even sort of completed while this case was being litigated in court. Can you help me just understand how those two relate together? Yes, absolutely. Dr. Hanley's position was protected by significant written procedures, the bylaws, as well as an affiliation agreement between SUNY Downstate and Kings County Hospital, and as such, she had the right to notice of any intent to not renew her clinical privileges, and she had the right to be heard to respond to such allegations. She had none. There was a secret medical board hearing. You know, I understand your argument, and it maybe is just an unanswerable question. It's not, actually. I guess I'm just trying to figure out when were the privileges sort of finally revoked versus, I guess, suspended in some way, and it seems like maybe you're saying at the time the medical board took its action, that was the final act and the hearing was an opportunity to reverse that, but it was final as of the time the medical board acted? Well, at the time the medical board recommended non-renewal of her privileges. She could no longer practice and lost her employment. It was not for another five years that she had the final hearing making that decision final, and that was on the eve of trial. And I'm trying to figure out, so it's hard to analyze the due process. claim, the pre-deprivation notice and process argument, but it strikes me that your side went to great lengths to carve off the subsequent hearing process from the universe of evidence that was sort of relevant to the jury's consideration, and I'm struggling with how to reconcile that with a due process claim that I think would require us to look at it. Can you help me understand how we do that? Yes, I can try. Well, there are two things here. So first she was entitled to a pre-deprivation hearing. Then she was, of course, entitled to a post-deprivation hearing. Due process was denied her because she didn't have that hearing for five years. Now, as far as what the jury was able to consider and not able to consider, we requested that the jury not consider the lengthy hearing decision because that would have been prejudicial, and that wouldn't have allowed the jury to make their own assessment, and the district court correctly excluded that decision from the jury's consideration, recognizing it was unduly prejudicial. What about the argument that it's not really done, the deed isn't done until the final decision-maker acts, and so if we're evaluating the decision to withdraw the privileges, that hearing was the ultimate decision-maker. That's obviously not how this was tried. I'm just wondering whether there was discussion of that. I think that that's not a valid conclusion to draw here because the age discrimination happened. Dr. Hamill is protected by federal and state and city age discrimination law, and the age discrimination happened at the time that her clinical privileges were suspended, and then at the time her employment was terminated, so that happened. Just a related question, and I read some of the discussion in the transcript, but I maybe don't have the whole context. There was a decision made to instruct the jury as if Dr. Hamill was the one who sort of terminated her privileges, or at least there was a presumption that if his conduct was motivated by age-related bias, that that would be imputed to the medical board that relied on his advice, maybe sort of what some people call the cat's paw theory. Was it just that collapse, that finding kind of cut out of the mix because it was viewed as so self-evident that it might be confusing to the jury? I mean, it was the medical board that terminated the privileges. Right, so that's my third point of the third clear error that requires a new trial in this case because Judge Block decided that the jury should only be instructed as to liability for Dr. Hamill, not HHC, over the objections of both plaintiff's counsel and defendant's counsel who asked that the instruction read, if you find that HHC, that age discrimination was a motivating factor in HHC or Dr. Hamill's recommendation to not renew privileges, then you must find for the plaintiff. And that's an error that we care about if we conclude that the jury's conclusion that Dr. Hamill didn't engage in age-related bias is not supported. In other words, if the jury's finding on that question stands, then it doesn't really matter if there's vicarious liability because there's nothing to vicariously pass it on. Right. There was also no cat's paw instruction given despite that being requested and no joint liability instruction given. However, that instruction was very misleading to the jury, and it led the jury to make a very erroneous conclusion here where they couldn't find ample evidence introduced all during the trial that HHC, the medical board, made the non-renewal decision and that Dr. Hamill only provided information to them. Patel provided information to the medical board. But it was HHC's decision. It was the medical board's decision. Was there independent evidence that HHC, in some way other than through Hamill and Patel, would have been acting in an age-discriminatory way? Right. So I hear what you're saying, and I understand that it was sort of potentially confusing, but if a jury found that Dr. Hamill, in making his recommendation to HHC, was not conveying age-discriminatory purpose or wasn't infected in some way, then how would HHC have been acting on age discrimination? We don't have evidence that there were some other people involved with HHC who independently had a discriminatory animus, right? It had to come through Hamill or Patel, right? Right. Dr. Patel presented misleading claims of patient safety issues to the medical board, and they acted based on her claims. But what Judge Robinson, I think I'm following up on her question, in that once the jury finds that age discrimination didn't come into play by the individuals, does it matter whether HHC was included, if we agree that that is not error? Well, we understand that the discrimination of individual defendants can be imputed to the employer, whereas the jury has no such understanding, and they receive no instruction. But if they found no discrimination by the individuals, then would the imputation problem, if there is one, actually be a problem? But the way the question was posed to the jury was, if you find that Dr. Hamill didn't renew her privileges, then you must find. Can I ask you a logistical question? You're not appealing the due process, the Grants of Summary Judgment on due process to the state defendants, is that right? That's correct. Okay, thank you. I think I'm slow, but I think I'm getting it here. Is your argument that if the jury had realized that the board and HHC would be derivatively liable, they may have viewed the question of whether Dr. Hamill engaged in age-related bias differently? Absolutely. I see. Yes, and there were several evidentiary errors that made a significant difference here. For one, there was an age-discriminatory comment that Dr. Hamill made to Sandra Guthrie, who works in the Medical Credentialing Office, saying when he was presented with Dr. Chowdhury, another doctor who was in her 60s, shouldn't she be retiring by now? And the district court, at summary judgment, found that that qualified for a hearsay exemption. It was a statement made in the context of the person's employment. But that's one step of it. It's a double hearsay. When it got to trial, it was offered, potentially going to be offered through the plaintiff, not through Guthrie. So at summary judgment, the court could have assumed, well, if Guthrie were to testify, it's single hearsay. Guthrie is saying, I heard Hamill say, and that's a party opponent or whatever exception you want to apply. But at trial, the way the transcript reads, it looks like the suggestion was, and through the motion to eliminate process, plaintiff would testify, Guthrie told me that Hamill told her. And so I'm not sure your argument, first, it's not necessarily binding on the district judge, but I'm not sure that the idea of curing just one half of the hearsay solves your problem at trial, where Guthrie's not offered, right? Guthrie's not proposed as a witness to testify about this, is she? She was, indeed, proposed as a witness. And the district court said that she could not testify full stop? The district court said that that would be hearsay. No. Sorry. I've got to jump in on that. I'm looking at the transcript. It says the court indicated the proffer testimony sounded like hearsay, but concluded, we'll see what plaintiff says and what the questions are, and we'll make our rulings at that time, meaning at trial. Never offered any witness to, you asked the questions of Dr. Hamill, but nobody ever offered testimony, whether as double hearsay or from Guthrie herself, as to whether or not he said that. That never happened. So there was never an opportunity to present it, have the court have an objection, have the court say no, preserve the record for appeal. None of that happened. Did it? Am I missing something? Well, there was an objection at trial, and there are some rulings that were in chambers that were not part of the record, unfortunately. But unless I'm mistaken, at trial it never arose, and it seems to me the trial judge was quite correct to not make the decision until it was presented to him, and it never arose at trial because that witness was not offered. Am I wrong? That witness was not offered. You're correct. Okay. So you mentioned, and this doesn't sound like it's part of your challenge. Is there something about all of this that was adjudicated in chambers not on the record? Is that what I've gathered? Yes, some of it was. And it was very strange that the court went a different direction than the way he had gone at trial, where he recognized that an age-discriminatory remark like this went to the core of the age-discrimination claim. So there was some ruling that was something that you perceived as a ruling in chambers, but nobody ever came and put it on the record to make it a formal ruling that would be reviewable? It's my understanding that we did have objections on the records. I don't have the site right here at the time. That would be really helpful. Maybe during your, you're going to get another chance to come talk to us. If you could point us to the transcript site or the appendix site or something, that would be really helpful because I was struggling to find where the error at trial actually occurred. Okay. I will do that. I appreciate that. There were other trial errors as well where the court allowed in 2015 counseling by a different supervisor, which was much more prejudicial than it was probative. So I tell you, we're going to get to hear from you, and I know we've got your arguments in the briefs on that, so maybe you can take a seat and we'll hear from, I guess, I don't know who's first, the city or the? The city. Okay. Attorney Magnetti. Thank you. Good morning, Your Honors. May it please the Court, my name is Shane Magnetti, and I represent the municipal defendants here. I'd like to just pick up on the Sandra Guthrie comment there. If you look at page 1370 of the record, what happened was defense counsel asked Judge Block for clarification on the scope of whatever they had discussed in chambers. And Judge Block said, I think I indicated that sounded like hearsay to me. We'll see what she says and what the questions are, and we'll make our rulings at that time. After that happened, plaintiff never sought to introduce Sandra Guthrie as a witness. She did not even object to that ruling. So she was certainly not precluded from proffering that evidence at trial. I'd like to discuss the procedural due process claims as well. At summary judgment, the district court correctly concluded that Dr. Hanley did not have a constitutionally protected property or liberty interest in her privileges. So let me ask about that. That was kind of an interesting, you know, there's this Greenwood case, and it's a pretty old case. And so the sort of facial distinction from Greenwood was, well, Greenwood had a, quote, permanent appointment. But when you read Greenwood, the reason the court concluded that there was a due process property interest in the privileges was that in order to revoke the privileges, you had to go through a certain process. It wasn't something you could just do as a matter of course. We have in the record here that in order to not renew the privileges, you have to go through a certain process. Why isn't this sort of Greenwood on all fours? Well, I think Greenwood is distinguishable both because of the permanent appointment and because the bylaws at that hospital expressly stated that physicians had a due process interest in their clinical privileges. Did the decision say that it used the words due process interest? Yes. Yes. And if you look at the reappointment process here, if you look at KCH's bylaws, there's no guarantee of continued employment to any physician. In fact, the bylaws expressly disclaim that. They say that no physician shall be entitled to membership on the medical staff or be able to exercise clinical privileges because they currently have or previously have had such privileges. And if you look as well at the steps delineated for the renewal process, they state that each recommendation for reappointment shall be based on the department chair's careful reappraisal of the medical staff member's professional performance, et cetera. Now, that indicates that Health and Hospitals has discretion over whether or not to renew any individual physician's clinical privileges. To establish that she had a property interest in her privileges here, plaintiff had to show that she had a legitimate claim of entitlement from some independent source like state law, from the bylaws, from some written policy or understanding. But the bylaws here indicate that it is a discretionary determination for Health and Hospitals to make. So it doesn't rise to that level of a protected property interest. But doesn't your argument end with the statement that you already made, that is, the bylaws saying no physician shall be entitled to membership on the medical staff or be able to exercise clinical privileges in the hospital because she currently has or previously had such privileges at this or another hospital? Isn't that the end of the argument? I would say so, Your Honor. I think that expressly disclaims the idea that any individual physician has any kind of guarantee that their privileges will be renewed here. So how do you then square that? You're entitled to ask for a hearing if your privileges aren't renewed, and you're entitled to a whole bunch of process that's laid out in the bylaws. What would the standard be? What would the question be in that hearing if what you're saying is there is complete discretion for any reason or no reason at all to terminate this? It's sort of an at-will situation or to non-renew it. What would the purpose of the hearing be? The purpose of the hearing is to allow the physician to show that they do have the qualifications to continue working at the hospital. But the purpose of those qualifications is to protect patient interests and patient safety, not to afford any protected constitutional right to physicians at the hospital. And if it were the case that the substantive constitutional right could be derived from the fact that there's process in place to allow physicians to contest the renewal of their privileges, then H&H would be disincentivized to afford that process in the first place. And I think the Supreme Court expressly cautioned against taking that approach in Loudermill. It held that the categories of substance and procedure are distinct, and property cannot be defined by the procedures provided for its deprivation. So I think here you have to look to something more than the fact that there are discretionary procedures in place for renewal here. Now, I'd like to also make another point about the affiliation agreement that plaintiff raised in her argument. That argument is not preserved. If you look at her summary judgment papers, her argument was that the property interest arose from the bylaws, not from the affiliation agreement, not from anything else. And in her opening brief, she argues that the property interest arose from the length of her history and from the bylaws, not from anything else. Now, on reply, she offers this new theory that it could be gleaned from a combination of the bylaws, the affiliation agreement, and her partially completed renewal packet. Those arguments are not properly before this Court. I'd also like to mention that although it's true that there was a delay in the hearing and in the appeal process here at the administrative level, during that time, Dr. Hanley had an Article 78 procedure available to her. She just never availed herself of it. And at the very least, Dr. Hamill and Dr. Patel would be entitled to qualified immunity here. I think that there's really no clearly established right. No court has held that public employees have a freestanding property interest in the renewal of a temporary job appointment. So I think it would be reasonable for Dr. Hamill and for Dr. Patel to understand that plaintiff did not have a guarantee of continued employment as the district court held. I'd like to address some of counsel's discussion previously about the trial errors. Can I just quickly move on? Sure. We were talking about the termination of her privileges, and then you started talking about termination of employment. Privileges in themselves aren't employment, right? Correct. They're eligibility to practice. Should we be viewing privileges, though, through the lens of kind of the case law that relates to employment? Like, is that, even though it's not employment, is that the right frame that we should be using for evaluating your rights and process and things as it relates to privileges? I think the framework would be the same. I think the framework is just to look for some legitimate claim of entitlement to it, because at the end of the day, her employment was tied to the privileges, though they are distinct. So if I could touch on the vicarious liability and the aider and the better liability points. Counsel never asked for an instruction on vicarious liability. Counsel never asked Judge Block to instruct the jury that H&H would be imputed with any bias they put on Dr. Hamill. Why was it structured this way where the jury is essentially asked to adjudicate Dr. Hamill's conduct and then sort of rather than the board's decision, right? I mean, the board's conduct wasn't really presented to the jury. The board's review, or was it? It was not, and because at plaintiff's request, the judge precluded any evidence about the medical board proceeding and did not put the decision into evidence, because he wanted to avoid having secondary litigation about what happened at the medical board. And how did that make sense when it's the medical board that ultimately made the decision? Because the decision flowed from Dr. Hamill's recommendation to the medical board. Right, but usually you would handle that by saying it's a claim against the board on the basis of this so-called cat's paw theory. Dr. Hamill's bias, if you find that he has age-related bias, can be imputed to the board if they relied heavily on his decision. But it introduces this whole secondary question of whether the board did in fact rely on him and to what extent it relied on other factors. And that all just got cut out of the trial of this case, and I'm just trying to understand why. Well, plaintiff's counsel never asked for a cat's paw instruction. If you look at the charging conference, the concern about the instruction as to Dr. Hamill was that it used the phrase terminated. Dr. Hamill terminated Dr. Hanley's privileges, which wasn't true. He recommended renewal, and then the medical board ultimately made that determination. That was what both parties were worried about. And if you look at page 2226 of the record, all the parties reached an agreement on the instruction that was given. They all agreed that Judge Block would rephrase it to say that Dr. Hamill's decision that plaintiff's privileges should be revoked would be put to the jury. There was no further objection after that from defense counsel. And in any event, to even reach the theory of who was going to be liable for discrimination, the jury first had to decide that there was discrimination, and they found that age was not a determinative or motivating factor in Dr. Hamill's recommendations. So any error in the jury instructions would have made no difference to this trial. I see that my time is up. I'm happy to answer any further questions. Thank you. Thank you. Attorney Neal. Good morning, Your Honors, and may it please the Court. Samantha Neal for the State Defendants. The State was properly dismissed from the case at summary judgment. It is undisputed that the plaintiff's appointment as a clinical instructor with the university was expressly conditioned on her maintaining clinical privileges at Kings County Hospital. And so when the hospital terminated those privileges, the university intern had no choice but to decline to renew her academic appointment, because at that point the plaintiff was no longer able to, as a practical matter, access hospital facilities or otherwise enjoy the admitting privileges that were required for her to teach students there. That legitimate, non-discriminatory, and indeed mandatory reason for the non-renewal of her academic appointment provides a basis for this Court to affirm at the second step of the McDonnell-Douglas framework whether or not she has made out a prima facie case. But even if this Court reaches the question as to whether she has made out a prima facie case, she hasn't as to any of the State Defendants. As an initial matter, I want to point out that as to the Defendant Suni, Suni enjoys sovereign immunity. That point is not contested. As to President Riley, there's nothing in the record that suggests that Dr. Riley approved the termination of her appointment for any reason other than that she failed to meet the mandatory employment condition. And I'll note the plaintiff's reply brief appears to abandon those claims against Dr. Riley and Suni. Moving on now to the claims against Dr. Reed, the only evidence that plaintiff puts forward with respect to Dr. Reed is the stray remark that was apparently made during a meeting with plaintiff in October of 2018. But this Court has said that as a matter of law, stray remarks are not enough to make out a prima facie case of discrimination. If we don't characterize it as a stray remark, isn't that sufficient to make out a prima facie case? I mean, it is a remark. I'm not quite sure what a stray remark is. So, no, Your Honor, for a few reasons. So a stray remark, number one, is a one-off comment, which this was. There's no dispute that the comment was not made repeatedly. But even if this Court doesn't just characterize it as a stray remark, you know, I want to note that in looking at the comment itself, the comment wasn't even directed at Dr. Hanley. It was made about kind of older doctors in general. And I want to note that Dr. Reed found plaintiff's performance to be satisfactory in her clinical instructor capacity. There was no reason for Dr. Reed to terminate the plaintiff. For any reason other than that, she failed to maintain the mandatory condition of her employment. But the remark is pretty striking, isn't it? They're sitting at conferences drooling and can't be awakened. That's insufficient to make out a prima facie case? No, Your Honor, because the comment was not directed at Dr. Hanley. But beyond that, I want to note that even if Dr. Reed secretly harbored a discriminatory intent against the plaintiff, she can't establish causation because it is undisputed that the mandatory condition of her employment was that she maintained clinical privileges. So independent of whether there is a discriminatory intent there, it is not the intent that was the causal trigger that caused the plaintiff's termination. And so for that reason, because plaintiff doesn't establish a prima facie case and because there's no causation, this Court should affirm the summary judgment. Does that hold? Is it a prima facie case under the New York City human rights law? There's a lot of law about how low that bar is. No, Your Honor. We would submit that it's not enough because, again, the comment was not even directed at the plaintiff. Everything in the record indicates that her performance was satisfactory for the State. And so, no, Dr. Reed had no reason to believe that age was – there's no reason to believe that age was a reason for her termination. And did the district court – I had the same question. Did the district court adequately, separately treat the NYCHRL issues at summary judgment as to your clients? We think so, Your Honor. So first of all, I want to note that the NYCHRL doesn't apply to the State as a matter – or it doesn't apply to SUNY as a matter of law.  That's right. Yes. But as to the remaining defendants for Eileen Reed, yes. So we just don't think there's enough there to even make out a claim under the New York City human rights law. Right. The separate question that's sort of the tangent from Judge Stein's question is, did the district court's decision do that or did it actually separately address NYCHRL adequately? We think so, yes. We think there's enough there to – on the New York City human rights law, yes. Okay. It's literally one sentence, right? The same conclusion holds with respect to NYCHRL?  Am I missing something? That's what I've got from the district court. And as Judge Stein points out, the same doesn't always hold true, right? The standard is much more generous on NYC and depending on when the claim is brought on NYS than on Title VII or ADA. That's right, Your Honor. But the analysis that the district court went through with respect to the State human rights law was cross-applied to the City human rights law, and even under that more lenient standard, there wasn't enough there to make out the prima facie case, even under that. So if there are no further questions, we would ask the Court to affirm. Thank you so much. Thank you. Justice O'Sullivan. I'd like to start by responding to counsel's suggestion that appellants abandoned any claim that the affiliation provides protections. In fact, we cited legal authority and identified provisions of both the affiliation agreement between HHC and SUNY Downstate and HHC's bylaws. Specifically, the affiliation agreement provides that such membership and privileges shall not be unreasonably withheld, limited, delayed, or withdrawn from any current or proposed physician providers. And this Court, the Second Circuit, in similar circumstances, held the plaintiff had a property interest in his position based on civil service law, which stated, a covered employee shall not be removed or otherwise subjected to any disciplinary penalty except for incompetency or misconduct shown after a hearing upon stated charges. And this was Chamberlain v. County of Nassau. The property interest can also arise from the party's previous conduct. Dr. Hanley's contract was renewed biannually over the course of 16 years. And similarly, the Court, this Court, interpreted a protected property interest for Dr. Ezekiel, whose residency rights were protected because of the party's course of conduct. Are you saying that because the contract was renewed for 16 years, that gives her a property right in having it renewed? She certainly had an expectation in having it renewed. However, the bylaws in the affiliation agreement provide the extent of the due process, which provides for extensive hearing requirements. So there's sort of the question of, on the due process, there's always pre-deprivation and post-deprivation. And it sounds like your focus is pre-deprivation more than – the post-deprivation sort of has to do with delay, but we're not – we don't really have the universe of information about why the delay and what the process was and all of that. So it's tough to evaluate that on the serving judgment record. Yes. Am I missing something about – That's correct. At summary judgment, there had been no post-deprivation hearing. There wasn't even a hint of one. But had there been – do we have in the summary judgment record evidence – I mean, I don't know. In my experience, people lawyer up. Those are sort of big deals, and these post-privileged – and those aren't something that happen – regardless of what the paper says, they take some time. I don't know whether that was true here. Well, the bylaws require that a hearing be scheduled within 20 days or as soon as it's practicable. Right. And there was nothing scheduled for five years. Okay. But that doesn't really tell us – I mean, it can say as soon as practicable within 30 days, but if, for example, she's hired counsel, she's retained experts, it's not – is there evidence in the record of a demand, I am ready for a hearing? Yes. There were numerous requests for a hearing. Yes. Okay. Okay. Where in the record? Can you tell us that? In the – okay. I cannot point to parts of the record where that appears. However, it's the response of the bylaw state that the KCHC is supposed to schedule this, and they didn't. The plaintiff did not have any control over when they scheduled it. Okay. But none of that's in the record. That's what I'm trying to figure out. Is there – Well, the bylaws are in the record. I understand that. But the bylaws set an entitlement, but they don't then tell us how everything unfolds, right? I mean, we also know there's a section – I always forget – the New York administrative action that one could initiate if the hearing was being denied, and that didn't happen either, I gather. Sorry, could you repeat that last bit? That didn't happen either? The state article – what's the article? Oh, Article 78. Thank you. I wanted to say 248. That wasn't right. Article 78, there's no attempt to jumpstart a hearing by initiating an Article 78 hearing saying they're denying – process saying they're denying me a hearing. She didn't elect to proceed that way, no. You were going to look up the record support for the claim that the court declined to allow this testimony about Guthrie, and I don't know whether you had a chance to find it during the other arguments. I know you were also probably listening. No, I wasn't able to find anything more on that. But, I mean, I would like to say that in making the recommendation not to remove the privileges, a quorum was required of 50 percent of the voting members pursuant to the bylaws. There was no quorum. Dr. Hanley was also entitled to a peer review given the claims that she – that Dr. Patel differed with her. Are those challenges that fit in the post-deprivation hearing? No, those fit in the pre-deprivation hearing. Pardon me? Those fit in the pre-deprivation hearing. So do you view the medical board – the medical board proceeding was a pre-deprivation hearing? Yes. I see. Okay. Because her privileges were simply suspended on May 24th, and then on June 28th, the medical board recommended non-renewal. And at that point, her employment – after that, her employment with SUNY was terminated. We've got case law that says you don't have to give a pre-deprivation hearing when there's concerns about clinicians' patient care, right? Is that – is there any exception to the pre-deprivation hearing relative to privileges if the non-renewal of privileges is due to concerns about patient care? No, there is not. I see. Okay. The practitioner is entitled to a hearing in accord with the bylaws and the affiliation agreement. Okay. Appreciate your arguments. Thank you both. Thank you. And I'll take it under advisement.